IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VIRGINIA ANNE VALYER,

  Plaintiff,

v.             Case No. 5:13-CV-4068-JTM

CAROLYN W. COLVIN,
Acting Commissioner of Social Security

  Defendant.


## MEMORANDUM AND ORDER

  Plaintiff Virginia Anne Valyer ("plaintiff") seeks review of a final decision by defendant, the Commissioner of Social Security ("Commissioner"), denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  In her pleadings, plaintiff alleges multiple assignments of error with regard to the Commissioner's assessment of her residual functional capacity and ability to do other work.  Upon review, the court finds that the Commissioner's decision was supported by substantial evidence contained in the record.  As such, the decision of the Commissioner is affirmed.

## I.  Factual and Procedural Background

  Plaintiff's mental health history is lengthy and dates back to her first admission to the Stormont Vail Hospital Partial Hospital Program ("PHP") on May 15, 2009.  Intake records indicated that plaintiff was self-admitted and claimed that she could not pull herself out of the "winter rut."  Plaintiff stated that she had several plans for suicide.  Her Global Assessment of

Functioning ("GAF") score at intake was thirty-five.[1]   Plaintiff was diagnosed with bipolar disorder not otherwise specified ("NOS").   She did well in the program and, at the time of discharge, was "pleasant, no suicidal ideation, mood much improved," and had a GAF score of fifty.[2]  Dkt. 9-8, at 41.

Subsequent to her discharge from the PHP, plaintiff began treatment with psychiatrist Dr. Taylor Porter, MD ("Dr. Porter") and registered nurse practitioner Josh Hartnett ("Hartnett").[3] Plaintiff saw Hartnett on a regular basis from June 2, 2009, through January 26, 2011.   Her original diagnosis, made in June 2009, was bipolar disorder I.   Plaintiff's symptoms and mood gradually improved throughout 2009.   In August, she stated that she was feeling much better and Hartnett noted that her affect was brighter and her mood improved.   In October 2009, plaintiff indicated that, while she felt "blah," she was emotionally more stable.   In November 2009, plaintiff reported having a good energy level and Hartnett noted that she had a moderate improvement on medication with no side effects.   Hartnett assigned plaintiff a GAF score of sixty.[4]  On November 17, 2009, Hartnett indicated that plaintiff's symptoms had been resolved.

In January 2010, plaintiff reported that her mood had been unstable and she was feeling anxious.   However, Hartnett's evaluation remained unchanged.   During a February 2010

---

[1] The GAF is a subjective determination based on a scale of 100 to 1 of "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) ("DSM-IV"), at 32.  A GAF score of 35 indicates some impairment in reality testing or communication or major impairment in several areas such as school, work, family relations, judgment, thinking, or mood.  *Id.* at 34.

[2] A GAF score of 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM-IV, at 34.

[3] The record indicates that plaintiff only actually saw Dr. Porter during her time in the PHP.  All of her subsequent therapy sessions were conducted by Hartnett.  However, the administrative law judge indicated that he considered the opinion of Hartnett as if it was also the opinion of Dr. Porter.  Dkt. 9-3, at 21.  This court will therefore do the same.

[4] A GAF score of 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV, at 34.

appointment with her primary physician, Dr. Michael R. Cox, MD ("Dr. Cox"), plaintiff indicated that she was doing very well with her psychiatrist and was "much happier on [her medications] and [was] doing really well with the combination of meds." Dkt. 9-9, at 3. Dr. Cox noted that plaintiff had lost a significant amount of weight and plaintiff stated that she seemed to have a diminished appetite as a result of her medications. Dr. Cox concluded that plaintiff was "doing much better overall mentally and physically." Dkt. 9-9, at 4.

In March 2010, plaintiff lost her job, allegedly due to falling asleep at work. On March 9, 2010, she was again admitted to the PHP. She presented with increased depression and suicidal ideation. Her diagnosis at admission was mood disorder NOS with a GAF score of twenty.[5] Plaintiff admitted to smoking marijuana on a daily basis, including on the date of her admission. Plaintiff was discharged from the PHP on March 12, 2010, with a GAF score of fifty-two.[6]

On March 14, 2010, Hartnett completed a Mental Residual Functional Capacity Questionnaire on behalf of plaintiff. He indicated that plaintiff's current GAF score was fifty and that her highest score during the past year was sixty-five.[7] Hartnett listed plaintiff's symptoms as anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with weight change, decreased energy, thoughts of suicide, feelings of guilt or worthlessness, impaired impulse control, deeply ingrained maladaptive patterns of behavior, persistent disturbances of mood or affect, memory impairment, sleep disturbances, emotionally withdrawn

---

[5] A GAF score of 20 indicates some danger of hurting self or others, or occasionally failing to maintain personal hygiene, or gross impairment in communication. DSM-IV, at 34.

[6] A GAF score of 52 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV, at 34.

[7] A GAF score of 65 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV, at 34.

or isolated, and bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes. He indicated that plaintiff's ability to do work-related activities on a day-to-day basis was fair, with the exception of the following, which he found to be poor or none: (1) work in coordination with or proximity to others without being unduly distracted, (2) complete a normal workday and workweek without interruptions from psychologically based symptoms, (3) perform at a consistent pace without an unreasonable number and length of rest periods, (4) get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, (5) respond appropriately to changes in a routine work setting, (6) deal with normal work stress, (7) understand and remember detailed instructions, (8) carry out detailed instructions, and (9) deal with the stress of semiskilled and skilled work. Harnett opined that plaintiff's impairment would cause her to be absent from work approximately four days per month. However, he indicated that plaintiff's impairment had not lasted and was not expected to last twelve months.

On March 17, 2010, plaintiff, at Hartnett's suggestion, again checked herself into the PHP. On admission, she identified her job as her primary stressor and staff noted that plaintiff had difficulty acknowledging her own role in her termination. Her GAF score was thirty-five. The PHP staff initially indicated that plaintiff's anticipated duration of stay was three to five days, but plaintiff requested to stay longer due to her "perceived inability" to maintain progress. Dkt. 9-8, at 74. Plaintiff was discharged on March 30, 2010, with a GAF score of forty-five.[8]

Upon her discharge, plaintiff resumed regular treatment with Hartnett. Again her symptoms improved. On April 14, 2010, plaintiff indicated that she got out of the house daily and did a lot of housework. Hartnett encouraged her to continue engaging in productive

---

[8] A GAF score of 45 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV, at 34.

activities at home and in the community.  On June 16, 2010, plaintiff saw Dr. Cox complaining of tremors in her hands and legs which had caused her to fall on two occasions.  After laboratory testing, Dr. Cox concluded that plaintiff suffered from lithium toxicity and lowered her dose.  During an appointment with Hartnett on June 25, 2010, plaintiff seemed to regress, stating that she did not care if she lived or died and would welcome death because it would mean that she would be going to a better place.  However, plaintiff also indicated that she was considering opening a daycare.

In July 2010, plaintiff told Hartnett that she had started babysitting a two-year-old boy.  She indicated that she was upset with her spouse because he was often critical, but noted that the couple had gone to a club with friends to listen to a blues band.  On August 10, 2010, plaintiff underwent a Psychiatric Review Technique with state examiner Dr. Lauren A. Cohen, PhD ("Dr. Cohen").  Dr. Cohen concluded that plaintiff suffered from bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes.  Dr. Cohen also indicated that plaintiff suffered from behavioral or physical changes associated with the regular use of substances that affect the central nervous system, namely cannabis.  The examiner concluded that plaintiff had a mild degree of limitation with regard to her ability to maintain social functioning, concentration, persistence, and pace.  Dr. Cohen did not find any episodes of decompensation.

In mid-August 2010, plaintiff again mentioned to Hartnett that she wanted to open a day care center or get involved with foster care.  Plaintiff went so far as to investigate the state requirements and regulations governing the presence of a day care in her home and, in October 2010, reported to Hartnett that she had to take a month-long state-required course. However, during an appointment on December 29, 2010, plaintiff informed Hartnett that the at-home day

care was not going to work because it would mean she would have to get rid of her pets. Hartnett noted that plaintiff had not had any recent episodes of depression.

Plaintiff's final documented appointment with Hartnett occurred on January 26, 2011. Plaintiff indicated that she was very occupied with taking care of her adult daughter, who had recently moved back in with plaintiff and her husband because she was pregnant.  Plaintiff stated that she was getting along well with her husband and was still enjoying babysitting.  Hartnett indicated that plaintiff's mood was stable and without depression.

On February 10, 2011, plaintiff underwent a Psychiatric Review Technique with state examiner Dr. Norman S. Jessop, PhD ("Dr. Jessop").   Dr. Jessop, much like Dr. Cohen, concluded that plaintiff suffered from bipolar disorder and cannabis dependence.  He concluded that plaintiff had mild restriction with regard to activities of daily living, moderate restriction with regard to maintaining social functioning, concentration, persistence, and pace, and no episodes of decompensation.  On that same day, Dr. Jessop also conducted a Mental Residual Functional Capacity Assessment of plaintiff.  He opined that plaintiff was moderately limited in her ability to: (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) maintain attention and concentration for extended periods, (4) work in coordination with or proximity to others without being distracted by them, (5) interact appropriately with the general public, (6) accept instructions and respond appropriately to criticism from supervisors, and (7) get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

On August 17, 2011, plaintiff presented to the Stormont Vail Emergency Room but left before she could be seen.  Hospital staff reached out to her and plaintiff was ultimately admitted for depression, mood instability, and suicidal ideation with an attempt by overdose.  She was

referred for acute psychiatric stabilization.  Her GAF score was twenty.  Plaintiff indicated that she had been doing well but that her illness had gotten worse during the past six to eight weeks. She improved during her stay and left a day earlier than recommended.  Her GAF score on discharge was forty.[9]  Following her discharge, plaintiff again entered the PHP on August 22, 2011.  She was discharged on September 1, 2011.

Plaintiff filed for DIB on April 15, 2010, alleging disability beginning March 9, 2010. Her claim was denied initially on August 11, 2010, and upon reconsideration on February 14, 2011.  Plaintiff timely filed a request for an administrative hearing, which took place on November 18, 2011, before Administrative Law Judge Michael D. Mance ("ALJ Mance"). Plaintiff, represented by counsel, appeared and testified.  Also testifying was Vocational Expert Janice S. Hastert ("VE Hastert").

At the time of the hearing, plaintiff was forty-four years old and residing with her husband, adult daughter, and grandson.  She testified that she last worked in March 2010 and was terminated because she was caught sleeping on the job.  When asked what prevented her from returning to work, plaintiff stated "[m]y medications, my mood swings.  All my meds and mood swings . . . make me tired all the time . . . [and] I've got tremors all the time."  Dkt. 9-3 at 36-37.  Plaintiff testified that she was also depressed and had back pain.  She stated that the depression would come and go but, at the time of the hearing, she was suffering from the longest bout that she had had in a while and that she was "feeling like killing everybody at some point." Dkt. 9-3, at 43.  When asked about the side effects of her medications, plaintiff reported having an ulcer, tremors, diarrhea, and fatigue.

---

[9] A GAF score of 40 indicates some impairment in reality testing or communication, or major impairment in several areas such as work, school, family relations, judgment, thinking, or mood.  DSM-IV, at 34.

Plaintiff testified that she has a short attention span, to the point where she likely should not drive because she does not notice things like red lights, stop signs, and pedestrians. However, she indicated that she still drives short distances.  Plaintiff stated that she does not go grocery shopping because she cannot be around people, but also stated that she can go out to dinner with her husband as long as the crowd is minimal.  She testified that she does not read or use the computer because of her lack of attention and concentration.  In contrast, the ALJ drew particular attention to the fact that plaintiff babysat a toddler for approximately a year.  Plaintiff testified that her daughter was home when the child was present.  ALJ Mance questioned plaintiff about her expressed desire to open a day care in her home.  Plaintiff indicated that she thought about it but eventually decided against it because she would have had to give away her pets.  She also stated that "it [was] a nice dream but I couldn't do it."  Dkt. 9-3, at 37.

In addition to plaintiff's testimony, ALJ Mance also sought the testimony of VE Hastert to determine how, if at all, plaintiff's impairments and limitations affected her ability to return to the workforce.  VE Hastert described plaintiff's past work as a phlebotomist as semiskilled and light.  Based upon plaintiff's testimony and his own review of the entire record, ALJ Mance asked the VE a series of hypothetical questions that included varying degrees of limitation on effort, skill, climbing, temperature, exposure to irritants, sitting and standing, and contact with coworkers and the general public.  Although the VE indicated that, with the restrictions as set forth by the ALJ, the hypothetical individual could not perform plaintiff's past relevant work, she stated that there was other work in the national economy that an individual with such limitations could perform.   When ALJ Mance included, in addition to these limitations, the need for unscheduled disruptions throughout the day, an inability to focus and concentrate for a full eight hours, the need to lie down due to side effects from medication, and general unreliability, the VE

indicated that no other work would be available.  During cross-examination, plaintiff's counsel set forth multiple hypothetical restrictions, none of which, according to the VE, would allow for either plaintiff's past work or other work in the national economy.

ALJ Mance issued his decision on March 9, 2012, finding that plaintiff suffered from a variety of severe impairments including diabetes mellitus, asthma, obesity, and a mood disorder also identified in the record as bipolar disorder.  Despite these findings, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  ALJ Mance concluded that plaintiff retained the residual functional capacity to perform light work with the following limitations: (1) lift and carry twenty pounds occasionally and ten pounds frequently; (2) occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; (3) occasionally stoop, kneel, crouch, and crawl; (4) temperature-controlled environment free from concentrated exposure to pulmonary irritants; (5) no exposure to excessive vibration, hazardous machinery, or unprotected heights; and (6) only unskilled work that requires no more than occasional contact with the public and coworkers.  The ALJ therefore concluded that plaintiff had not been under a disability, as that term is defined in the Social Security Act, since March 9, 2010, the alleged onset date.  The ALJ's decision became the final decision of the Commissioner on April 29, 2013.

On June 26, 2013, plaintiff filed a Complaint in the United States District Court for the District of Kansas seeking reversal and the immediate award of benefits or, in the alternative, a remand to the Commissioner for further consideration.  Given plaintiff's exhaustion of all administrative remedies, her claim is now ripe for review.

## II.    Legal Standard

Judicial review of the Commissioner's decision is guided by the Social Security Act (the "Act") which provides, in part, that the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).   The court must therefore determine whether the factual findings of the Commissioner are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).   "Substantial evidence is more than a scintilla, but less than a preponderance; in short, it is such evidence as a reasonable mind might accept to support the conclusion." *Barkley v. Astrue*, 2010 U.S. Dist. LEXIS 76220, at *3 (D. Kan. July 28, 2010) (citing *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994)).   The court may "neither reweigh the evidence nor substitute [its] judgment for that of the [Commissioner]." *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933 F.3d 799, 800 (10th Cir. 1991)).

An individual is under a disability only if he or she can "establish that she has a physical or mental impairment which prevents her from engaging in substantial gainful activity and is expected to result in death or to last for a continuous period of at least twelve months." *Brennan v. Astrue*, 501 F. Supp. 2d 1303, 1306-07 (D. Kan. 2007) (citing 42 U.S.C. § 423(d)).   This impairment "must be severe enough that she is unable to perform her past relevant work, and further cannot engage in other substantial gainful work existing in the national economy, considering her age, education, and work experience." *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *3 (citing *Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002)).

Pursuant to the Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. *Wilson v.*

10

*Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010); *see also* 20 C.F.R. § 404.1520(a). The steps are designed to be followed in order. If it is determined, at any step of the evaluation process, that the claimant is or is not disabled, further evaluation under a subsequent step is unnecessary. *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *4.

The first three steps of the sequential evaluation require the Commissioner to assess: (1) whether the claimant has engaged in substantial gainful activity since the onset of the alleged disability; (2) whether the claimant has a severe, or combination of severe, impairments; and (3) whether the severity of those severe impairments meets or equals a designated list of impairments. *Lax*, 489 F.3d at 1084; *see also Barkley*, 2010 U.S. Dist. LEXIS 76220, at *4-5 (citing *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988)). If the impairment does not meet or equal one of these designated impairments, the ALJ must then determine the claimant's residual functional capacity, which is the claimant's ability "to do physical and mental work activities on a sustained basis despite limitations from her impairments." *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *5; *see also* 20 C.F.R. §§ 404.1520(e), 404.1545.

Upon assessing the claimant's residual functional capacity, the Commissioner moves on to steps four and five, which require the Commissioner to determine whether the claimant can either perform his or her past relevant work or whether he or she can generally perform other work that exists in the national economy, respectively. *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *5 (citing *Williams*, 844 F.2d at 751). The claimant bears the burden in steps one through four to prove a disability that prevents performance of his or her past relevant work. *Lax*, 489 F.3d at 1084. The burden then shifts to the Commissioner at step five to show that, despite his or her alleged impairments, the claimant can perform other work in the national economy. *Id*.

### III.    Analysis

In her pleadings, plaintiff alleges that the ALJ failed to properly assess her residual functional capacity.  More specifically, plaintiff argues that ALJ Mance: (1) failed to properly weigh the opinion of her treating physicians, Dr. Porter and Hartnett; (2) inappropriately assigned the opinion of state examiner Dr. Jessop too much weight; and (3) failed to properly assess plaintiff's credibility.  Furthermore, plaintiff argues, since the ALJ's residual functional capacity assessment was improper, the hypothetical questions he posed to the VE were based on faulty limitations and restrictions.  As such, the VE's conclusions that there exists other work in the national economy that plaintiff can perform are incorrect.  Plaintiff's arguments fail.

### A.    Residual Functional Capacity Generally

"[R]esidual functional capacity consists of those activities that a claimant can still perform on a regular and continuing basis despite his or her physical limitations."  *White v. Barnhart*, 287 F.3d 903, 906 n.2 (10th Cir. 2001).  A residual functional capacity assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence."  SSR 96-8p, 1996 SSR LEXIS 5, at *19 (July 2, 1996).  The ALJ must also discuss the individual's ability to perform sustained work activities in an ordinary work setting on a "regular and continuing basis" and describe the maximum amount of work-related activity the individual can perform based on evidence contained in the case record.  *Id.*  The ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  *Id.*  However, there is "no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."  *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012).

1.      **Treating Physician Rule**

As a general rule, an ALJ has a duty to evaluate all medical opinions in the claimant's record, to assign weight to each opinion, and to discuss the weight given to the opinion.  *See* 20 C.F.R. §§ 416.927(c), 416.927(e)(2)(ii); *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012).  The opinion of a treating physician is generally entitled to controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence in the record."  *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007).  In the event that the ALJ decides that "the treating physician's opinion is *not* entitled to controlling weight, the ALJ must then consider whether the opinion should be rejected altogether or assigned some lesser weight."  *Id*. (emphasis added).  Relevant factors the ALJ may consider include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (internal quotations omitted).

"Under the regulations, the agency rulings, and our case law, an ALJ must give good reasons for the weight assigned to a treating physician's opinion."  *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (ellipsis omitted) (internal quotations omitted); *see also* 20 C.F.R. § 416.927(c)(2).   The reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight."  *Langley*, 373 F.3d at 1119 (internal quotations omitted).  "If the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so."

*Id.* (internal quotations omitted).  If the ALJ fails to explain how he assessed the weight of a treating physician's opinion, a court cannot presume that he actually applied the correct legal standards.  *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) (per curiam).

Here, there is no doubt that Dr. Porter and Hartnett were plaintiff's treating physicians. Plaintiff saw Hartnett numerous times from June 2009 through January 2011.  Despite this frequency, however, ALJ Mance assigned their opinion little weight, citing three factors for his decision: (1) the first opinion was issued on April 14, 2010, only thirty days after plaintiff's 2010 hospitalization; (2) the second opinion, dated October 17, 2011, indicates that there was no change in plaintiff's functioning despite medical evidence showing otherwise; and (3) the limitations contained in the opinions were expressly inconsistent with plaintiff's work as a babysitter.  Dkt. 9-3, at 21.  The ALJ also stated that, with regard to the October 2011 opinion, there were no records showing that either Dr. Porter or Hartnett had actually seen plaintiff since January 2011.  Dkt. 9-3, at 21.  Based on a review of the entire record, the court finds that ALJ Mance's decision to accord only little weight to the opinions of plaintiff's treating physicians was reasonable and based on substantial evidence.

On March 14, 2010, Hartnett completed a Mental Residual Functional Capacity Questionnaire on behalf of plaintiff.  He indicated that plaintiff's abilities to do work-related activities on a day-to-day basis were generally fair, with the exception of the following, which he found to be poor or none: (1) work in coordination with or proximity to others without being unduly distracted, (2) complete a normal workday and workweek without interruptions from psychologically based symptoms, (3) perform at a consistent pace without an unreasonable number and length of rest periods, (4) get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, (5) respond appropriately to changes in a

routine work setting, (6) deal with normal work stress, (7) understand and remember detailed instructions, (8) carry out detailed instructions, and (9) deal with the stress of semiskilled and skilled work.  Dkt. 9-8, at 91-94.  Harnett opined that plaintiff's impairment would cause her to be absent from work approximately four days per month.  Dkt. 9-8, at 95.  However, he indicated that plaintiff's impairment had not lasted and was not expected to last twelve months.  Dkt. 9-8, at 95.

Hartnett's opinion was rendered immediately after plaintiff's discharge from the PHP. However, prior to plaintiff's admission, she had indicated to Hartnett that she was doing better on her medication, her affect was brighter, her mood was improved, and she was enjoying life. Dkt. 9-9, at 50, 56.  Plaintiff also stated that she was emotionally more stable and that her relationship with her family was going well.  Dkt. 9-9, at 46.  During an appointment with Dr. Cox in February 2010, just three weeks before plaintiff began the PHP, plaintiff stated that she was "much happier on [her medications] and she [was] doing really well with the combination of meds."  Dkt. 9-9, at 3.  Dr. Cox concluded that she was "doing much better overall mentally and physically."  Dkt. 9-9, at 4.

Furthermore, only one month after Hartnett's opinion, in April 2010, plaintiff indicated that she was getting out of the house daily, feeling less fatigued, and had more energy.  Dkt. 9-9, at 27.  Records show that plaintiff was being proactive about her recovery, even going to the bookstore for books on self-esteem.  Dkt. 9-9, at 21.  Plaintiff undertook care for a two-year-old and consistently expressed interest in either opening a day care in her home or becoming involved in foster care.  Dkt. 9-9, at 15, 87, 89, 91.  In her last documented appointment with Hartnett, plaintiff indicated that she was busy taking her pregnant daughter to doctor's appointments, enjoyed babysitting, and was getting along well with her spouse.  Dkt. 9-9, at 98-

99.  Hartnett indicated that plaintiff's mood was stable and without depression.  Dkt. 9-9, at 99.  And, as the ALJ stated and the Commissioner correctly notes, there is no evidence in the record that either Dr. Porter or Hartnett actually *saw* plaintiff after her January 26, 2011, appointment.

This is not to say that plaintiff's general improvement did not have some setbacks.  During her time with Hartnett, plaintiff twice participated in the PHP, usually for depression and suicidal ideation.  Dkt. 9-8, at 43, 63.  In August 2011, plaintiff was admitted to the hospital with depression, mood instability, and suicidal ideation with an attempt by overdose.  Dkt. 9-10, at 15.  However, plaintiff improved during her stay and she even left the hospital a day earlier than was recommended.  Dkt. 9-10, at 18.

In any event, the court finds that ALJ Mance relied on sufficient evidence in deciding to accord the opinion of Dr. Porter and Hartnett only little weight.  As a general rule, the court "will not reweigh the evidence or substitute its judgment for that of the Commissioner."  *Romero v. Colvin*, 2014 U.S. Dist. LEXIS 39984, at *19 (D. Kan. Mar. 26, 2014) (citing *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005)).  However, the conclusions reached by the ALJ must still be reasonable and consistent with the evidence.  *See Glenn v. Shalala*, 21 F.3d 983, 988 (10th Cir. 1994) (holding that the court must affirm if, considering the evidence as a whole, there is sufficient evidence which a reasonable mind might accept as adequate to support a conclusion).  "Although the evidence may support a contrary finding, the court cannot displace the agency's choice between two fairly conflicting views, even though the court may have justifiably made a different choice had the matter been before it de novo."  *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).  As such, plaintiff's first assignment of error fails and is therefore dismissed.

2.      **State Examiner Opinion**

Plaintiff next argues that the ALJ erred by assigning great weight to the opinion of state examiner Dr. Jessop.  Generally, "[t]he opinions of physicians, psychologists, or psychiatrists who have seen a claimant over a period of time for purposes of treatment are given more weight than the views of consulting physicians or those who only review the medical records and never examine the claimant."  *Romero*, 2014 U.S. Dist. LEXIS 39984, at *7 (citing *Robinson*, 366 F.3d at 1084).  "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."  *Id*.  "If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it."  *Id*. at *7-8 (citing *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004)).

In his decision, ALJ Mance assigned Dr. Jessop's opinion great weight, noting that: (1) the opinion was consistent with Hartnett's progress notes that revealed that plaintiff seemed to improve with medication and therapy, and (2) as an agency examiner, Dr. Jessop has expert training on the Social Security rules and regulations.  Dkt. 9-3, at 21.  Plaintiff not only takes issue with this "bare bones" justification, but also questions why then, if ALJ Mance assigned the opinion great weight, did he not adopt Dr. Jessop's conclusion of mild limitation with regard to plaintiff's activities of daily living.

With regard to the opinions of non-treating physicians, the Social Security Regulations state that the ALJ will evaluate the opinion using a variety of factors, including the consultant's medical specialty and expertise in the Regulations, the supporting evidence in the case record, supporting explanations, and any other relevant factors, and that the ALJ will *explain in his decision* the weight given to a non-treating physician only when the treating source's opinion is

not given controlling weight.  20 C.F.R. § 416.927(e)(2)(ii); *see also Hamlin*, 365 F.3d at 1223

(holding that "[i]f an ALJ intends to rely on a nontreating physician or examiner's opinion, he

must explain the weight he is giving to it.").  Here, although the ALJ's justification is admittedly

minimal, it is sufficient.  The regulations do not say how *much* explanation is necessary, only

that the ALJ must provide one.  Furthermore, the ALJ's decision to not accept Dr. Jessop's mild

limitations with regard to activities of daily living is within his discretion, for ". . . an ALJ is not

required to accept, *in toto*, any one medical opinion as to limitations, and may properly find,

from all the evidence of record, limitations greater than those found by one physician or less than

those found by another."  *Kelley v. Colvin*, 2014 U.S. Dist. LEXIS 99262, at *15 (D. Kan. July

22, 2014) (internal citations omitted) (emphasis in original).  As such, the court finds that

plaintiff's second assignment of error fails.  It is therefore dismissed.

### 3.    Credibility

Finally, at least with regard to residual functional capacity, plaintiff argues that the ALJ

failed to reasonably assess her credibility.  More specifically, plaintiff argues that some of the

ALJ's findings are based on "conjecture, speculation, and personal opinion" while others are

either not supported by substantial evidence or are just a distortion of the evidence.  Dkt. 12, at

34.  ALJ Mance discounted plaintiff's subjective complaints for a variety of reasons, including:

(1) her minimal and conservative treatment, (2) her improvement with treatment, (3) work

history, (4) daily activities, (5) lack of medication side effects, (6) the objective medical evidence

and opinions, and (7) her own inconsistent reports.

Recognizing that "some claimants exaggerate symptoms for the purposes of obtaining

government benefits," (*Bolan v. Barnart*, 212 F. Supp. 2d 1248, 1260 (D. Kan. 2002) (citing

*Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987)), an ALJ's credibility determinations are

generally treated as binding on review. *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990); *Broadbent v. Harris*, 698 F.2d 407, 413 (10th Cir. 1983). "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence. *Wilson*, 602 F.3d at 1144; *Hackett*, 395 F.3d at 1173. The court cannot displace the ALJ's choice between two fairly conflicting views even though the court may have justifiably made a different choice. *Oldham*, 509 F.3d at 1257-58. However, notwithstanding the deference generally given to an ALJ's credibility determination, "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Wilson*, 602 F.3d at 1144 (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1998)).

In support of her argument, plaintiff sets forth a variety of errors with regard to the ALJ's assessment of her credibility. First, plaintiff argues that the ALJ erred by finding that she left employment because she was fired for falling asleep on the job, not because of her anxiety and depression. According to plaintiff, she only fell asleep because fatigue was a side effect of her medication. However, as the ALJ noted, while plaintiff testified that she suffered from medication side effects including an ulcer, tremors, diarrhea, and fatigue, the balance of the medical record belies this assertion. On numerous visits with Hartnett he noted that plaintiff had moderate symptom improvement with no medication side effects. Dkt. 9-9, at 38, 40, 44-45. In fact, when stabilized on her medications, plaintiff often described an improvement in her energy level. Dkt. 9-9, at 25, 31, 44. In a February 2010 appointment with Dr. Cox, plaintiff noted that she was "doing really well with the combination of meds." Dkt. 9-9, at 3. "An ALJ has good reason to reject testimony regarding side-effects from medication, when no evidence exists that

the claimant mentioned such side-effects to his or her physicians." *Burger v. Apfel*, 1998 U.S. Dist. LEXIS 21879, at *27 (D. Kan. Sept. 24, 1998) (internal citations omitted).

Furthermore, plaintiff was presumably on these same medications when she began babysitting a two-year-old. As ALJ Mance stated, plaintiff seemingly had no difficulty with falling asleep while performing this task, which the ALJ described as requiring "more than a modicum of attention." Dkt. 9-3, at 18. Plaintiff argues that her adult daughter was always present while she was babysitting, but there is no evidence in the record to support this assertion. Moreover, plaintiff repeatedly indicated to Hartnett that she wanted to open a day care or become involved in foster care, two activities that seem at odds with fatigue and/or falling asleep due to medications.

Plaintiff next argues that the ALJ erred with regard to his assessment of plaintiff's activities of daily living. The ALJ noted that, in two separate function reports, plaintiff indicated serious limitations with regard to her abilities and that she relied on others to do much of the cooking and cleaning. However, during her testimony, plaintiff indicated that she can cook, just "nothing fancy." Dkt. 9-3, at 48. She also stated that she sometimes goes out with her husband. Dkt. 9-3, at 51. The record also reveals that, in addition to babysitting, plaintiff engaged in work around the house, including gardening. Dkt. 9-9, at 24. In April 2010, plaintiff told Hartnett that she got out of the house daily and records show that she went to the library, the bookstore, and out with her husband and friends to a club to listen to a blues band. Dkt. 9-9, at 16, 21, 27. Furthermore, plaintiff's desire to open a day care center or become involved in foster care contradicts her assertion of severe limitations. In fact, plaintiff told Hartnett that her only reason for not pursuing these activities was because she would have to give away her pets. Dkt. 9-9, at 27. She confirmed this fact during her testimony. Dkt. 9-3, at 37.

Plaintiff also takes issue with the fact that ALJ Mance found her symptoms to be well-controlled with treatment.  As the ALJ noted, prior to her March 2010 hospitalization, plaintiff was making consistent progress through a combination of medication and therapy.  Plaintiff repeatedly stated that she was feeling much better, her mood was improved, and her affect was brighter.  Dkt. 9-9, at 44, 50, 56.  She rated her mood as stable.  Dkt. 9-9, at 46.  In December 2009, plaintiff reported that she was feeling moodier and more withdrawn, but notes indicate that she did not timely refill her medication and had therefore gone for three days without it.  Dkt. 9-9, at 41.  Immediately after her hospitalization, plaintiff reported feeling better and stated that she was getting out of the house daily.  Dkt. 9-9, at 27.  While plaintiff had a relapse in August 2011, presumably while still on her medications, ALJ Mance noted that there are no actual *therapy* records for approximately eight months prior to this relapse.  At plaintiff's last documented appointment with Harnett, he noted that plaintiff's mood was stable and without depression. Dkt. 9-9, at 98.

Finally, plaintiff takes issue with the ALJ's discounting of her husband's third-party statement.  In a June 2010 report, plaintiff's husband, David Valyer ("Mr. Valyer") reported that plaintiff spent most of her day resting and watching television and that, depending on what stage of depression she was in, she might spend several days at a time in bed.  Dkt. 9-8, at 15-16.  Mr. Valyer also noted that plaintiff only made simple meals several times per week and that she had no energy.  Dkt. 9-7, at 17.  He reported doing all of the shopping and managing the finances because plaintiff was not reliable and did not do well around people.  Dkt. 9-7, at 18-20.  A report from January 2011 relayed similar information.  Dkt. 9-9, at 76-83.  In his decision, ALJ Mance discounted Mr. Valyer's reports, finding them "largely duplicative and cumulative" of plaintiff's testimony.  Dkt. 9-3, at 21-22.  Because the court finds the ALJ's credibility

assessment of plaintiff to be based on substantial evidence, it cannot say that the ALJ's assessment of Mr. Valyer was in error.

As noted above, credibility findings are the province of the ALJ and will be affirmed if supported by substantial evidence. *Wilson*, 602 F.3d at 1144; *Hackett*, 395 F.3d at 1173. Based on a thorough review of plaintiff's record, the court finds ALJ Mance's assessment of plaintiff's credibility to be based on substantial evidence. As such, plaintiff's third assignment of error fails and is therefore dismissed.

**B.     Vocational Expert Testimony**

Finally, plaintiff alleges that, since ALJ Mance erred by improperly assessing her residual functional capacity, his hypothetical questions to the VE were based on faulty limitations and restrictions. As such, the VE's testimony that there exists other work in the national economy that plaintiff could perform cannot be considered substantial evidence. As a general rule, "[h]ypothetical questions posed to the vocational expert must reflect with precision a claimant's impairments, *but only to the extent that they are shown by the evidentiary record*." *Hawkins v. Astrue*, 2011 U.S. Dist. LEXIS 110221, at *14 (D. Kan. Sept. 27, 2011) (citing *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996)) (emphasis added). Here, because the court finds that the ALJ's assessment of plaintiff's residual functional capacity was based on substantial evidence, and because the ALJ based the limitations in his hypothetical questions posed to the VE on this assessment, it finds plaintiff's argument fails. As such, plaintiff's fourth assignment of error is therefore dismissed.

**IT IS THEREFORE ORDERED** this 23rd day of September, 2014, that plaintiff's

appeal is hereby denied.

s/ J. Thomas Marten
J. THOMAS MARTEN,
CHIEF JUDGE
